Argued and submitted April 7, affirmed November 13, 2003

Katalin KISH,
nka Katalin Nyitrai,
*Appellant,*

*v.*

Marie KUSTURA,
personal representative of the
Estate of Laszlo Szender,
*Respondent.*

99-2205; A113094

79 P3d 337

Jeffrey M. Batchelor argued the cause for appellant. With him on the briefs were Leah B. Cronn and Markowitz, Herbold, Glade & Mehlhaf, P.C.

W. Louis Larson argued the cause for respondent. With him on the brief were Larson & Fischer, H. Patrick Lavis, and Lavis & DiBartolomeo, P.C.

Before Landau, Presiding Judge, and Armstrong and Brewer, Judges.

ARMSTRONG, J.

## ARMSTRONG, J.

Plaintiff appeals from a judgment that reformed a contract for the sale of an apartment complex and awarded relief to defendant on the reformed contract. Plaintiff assigns error to the trial court's reformation of the contract and its award of damages, attorney fees, and costs, arguing that defendant did not prove her reformation claim by clear and convincing evidence. We conclude that defendant did prove her claim and therefore affirm the trial court judgment.

We review a grant of reformation *de novo. Krueger v. Ropp,* 282 Or 473, 478-79, 579 P2d 847 (1978). Although we are not bound by the trial court's findings, "we give substantial weight to [its] findings where, as here, those findings hinge on the resolution of conflicting testimony and the credibility of the witnesses." *Pioneer Resources, LLC v. D.R. Johnson Lumber Co.,* 187 Or App 341, 343, 68 P3d 233, *rev den,* 336 Or 16 (2003) (citation omitted).

The trial court's findings can be summarized as follows: Defendant Nustura is the personal representative of the estate of her father, Laszlo Szender. Plaintiff and Szender became friends in the late 1980s. By early 1990, Szender's health was failing. His health problems led him to seek a buyer for a 24-unit apartment complex that he and his wife lived in and managed. Although Szender, a native Hungarian, never learned to read or write English, he successfully operated a small business for more than 20 years.

Plaintiff was interested in buying the apartments and began to negotiate with Szender in 1990 to purchase them. Plaintiff eventually agreed to buy the apartments from Szender for $600,000. Most aspects of their initial agreement were memorialized in a letter that plaintiff wrote to Szender. The letter, after it was modified by the parties, provided that plaintiff was to pay Szender a down payment of $40,000, monthly payments of $2,000 for ten years, and a final payment of $90,000. The letter also provided that plaintiff was to assume a $230,000 mortgage on the apartments. After further negotiations, plaintiff agreed to several additional provisions that Szender requested. They included plaintiff's acceptance of the apartments "as is" and a provision that

entitled Szender and his wife to live in their apartment rent free for ten years after the sale. Plaintiff also agreed to prepare a written contract that accurately reflected her and Szender's letter and oral agreement. She later arranged for an attorney to prepare the contract for the parties. Both plaintiff and Szender signed the contract on January 29, 1991.

The written contract did not, however, accurately reflect the parties' oral agreement. It gave only Szender—not Szender and his wife—the right to live in their apartment rent free for ten years. It also provided that the interest payments that plaintiff made on the mortgage would apply to the $600,000 purchase price for the apartments. That change meant that the amount that plaintiff paid to Szender would not equal the agreed amount of $370,000. The change was never discussed with Szender. Plaintiff did not present Szender with the contract until the day that the parties signed it, and she did not translate it for him. Plaintiff continued to represent to Szender that the written contract accurately reflected their agreement.

Over the next seven years, plaintiff made payments to Szender and the mortgage holder that totaled approximately $630,000. During that period, the Szenders lived in their apartment rent free. Szender died on July 31, 1998. After his death, plaintiff demanded in a May 1999 letter that Mrs. Szender pay rent if she continued to live in the apartment. Plaintiff also claimed in the letter that she had fulfilled her obligations under the contract and was entitled to receive a deed to the property. Mrs. Szender refused to transfer the deed or pay rent and subsequently moved out of her apartment. Plaintiff then brought an action for specific performance of the contract. Defendant alleged several counterclaims, including a claim for reformation of the contract. The trial court denied plaintiff's claims and granted defendant's counterclaim for reformation. The court reformed the contract to include Mrs. Szender as a beneficiary of the ten-year, rent-free period on the apartment and to provide that the interest payments on the mortgage were not to be counted as payments toward the $600,000 purchase price. The court also found that plaintiff had constructively evicted Mrs. Szender from the apartment. The court ordered a separate trial on the

damages caused by the constructive eviction. At that trial, the trial court found that the rental value of the apartment was $600 a month and that plaintiff had constructively evicted Mrs. Szender from the apartment for a period of 19 months.

■■ To obtain reformation of a contract, a party must prove by clear and convincing evidence

> "(1) that there was an antecedent agreement to which the contract can be reformed; (2) that there was a mutual mistake or a unilateral mistake on the part of the party seeking reformation and inequitable conduct on the part of the other party; and (3) that the party seeking reformation was not guilty of gross negligence."

*Jensen v. Miller*, 280 Or 225, 228-29, 570 P2d 375 (1977) (citations omitted). Clear and convincing evidence is evidence that makes a fact in issue highly probable. *Riley Hill General Contractor, Inc. v. Tandy Corp.*, 303 Or 390, 402, 737 P2d 595 (1987). " '[C]lear' describes the character of unambiguous evidence, whether true or false; 'convincing' describes the effect of evidence on an observer." *Id.* at 397.

■ "Although reformation requires sufficient proof of an antecedent agreement, there 'need not be a binding agreement prior to the writing of which reformation is sought.' " *Pioneer Resources*, 187 Or App at 367 (quoting *DeTweede v. Barnett Estate*, 160 Or 406, 411, 85 P2d 361 (1939)). Here, the letter that plaintiff sent to Szender and testimony by witnesses at trial about the agreement constitute clear and convincing evidence that the parties did, in fact, have an agreement antecedent to the written contract. The pertinent details of the antecedent agreement are set out above. Although plaintiff's testimony would, if believed, raise doubt about the antecedent agreement, we defer to the trial court's express and implied findings that plaintiff was not a credible witness. The trial court found, and the record reflects, that plaintiff's trial testimony conflicted substantially on several important issues with the testimony that she gave at her deposition. The remaining testimony on the issue of the parties' initial agreement comes from several sources, including Mrs. Szender and Betty Stuhr, a friend of plaintiff and the Szenders. That testimony indicates that the parties agreed

that the interest payments on the assumed mortgage were not to be included in the $370,000 that plaintiff was to pay Szender for the apartments and that Szender and Mrs. Szender were to have the right to live in their apartment rent free for ten years.

"[T]he range of misconduct termed 'inequitable' is quite broad, varying from the most egregious and concrete, such as fraud, to more amorphous and somewhat less egregious misconduct, sometimes described as 'overreaching' or 'sharp practice.'" *Murray v. Laugsand,* 179 Or App 291, 302, 39 P3d 241 (2002). Inequitable conduct includes a party's silence where that "party knows that the other party is materially mistaken as to a writing's scope and effect, but remains silent, hoping to take advantage of the other's mistake." *Pioneer Resources,* 187 Or App at 376.

■ Plaintiff and Szender agreed that plaintiff would purchase the apartment complex by paying Szender $370,000 and assuming a $230,000 mortgage, for a total purchase price of $600,000. Szender and his wife were also to live in their apartment rent free for ten years. Although the written contract deviated from the parties' agreement, Szender did not learn of the differences before he signed the contract because he could not read the contract and did not have anyone translate it for him. Instead, he relied on plaintiff's assurances that the written contract accurately reflected the parties' earlier agreement.

Szender trusted plaintiff because they were both Hungarian immigrants and were friends. The trial court found that this trust among fellow Hungarian immigrants was common. For several months before the parties signed the contract, plaintiff represented to the Szenders and others that the Szenders would have the right to live in their apartment for ten years and never gave Szender any reason to believe that the interest payments plaintiff made on the mortgage would count toward the purchase price. Szender spoke hardly any English, and neither his wife nor Betty Stuhr, who were also at the signing, understood English well enough to translate the contract for Szender. Plaintiff was the only person at the signing who could have translated the document for Szender, and Szender trusted her. Plaintiff

took advantage of Szender's trust in her and his inability to read or speak English. Plaintiff presented Szender with the written contract the day that the parties signed it and told him that it represented their prior agreement when she knew that it did not. That was not mere silence with the knowledge that Szender was materially mistaken as to the contents of the contract; it was an active misrepresentation. As written, the contract reduced the amount that Szender was to receive by over $130,000. It also limited the apartment tenancy to the earlier of either Szender's death or the expiration of ten years, rather than to a ten-year period. Because of his misplaced trust in plaintiff, Szender signed the contract believing that it conformed to their prior agreement. Defendant has established by clear and convincing evidence that plaintiff was aware of Szender's mistaken belief that the contract conformed to their prior agreement and has therefore proved the second element of her claim for reformation.

A party seeking reformation must establish that the mistake that the party seeks to reform in a contract was not the product of the party's gross negligence. *Foster v. Gibbons,* 177 Or App 45, 54, 33 P3d 329 (2001). For conduct to amount to gross negligence, it "must go beyond mere oversight, inadvertence, or mistake and, instead, must amount to a degree of inattention that is inexcusable under the circumstances." *Id.* Gross negligence is not a static concept but requires a fact-intensive inquiry to determine if a party's inattention is excusable. *Id.* A party's failure to read a contract, standing alone, generally is insufficient to constitute gross negligence. *Wolfgang v. Henry Thiele Catering Co.,* 128 Or 433, 445-47, 275 P 33 (1929).

Here, Szender's failure to have the document translated into Hungarian is akin to a failure to read the document. Although that failure was perhaps negligent, it does not amount to inexcusable inattention under the circumstances. In fact, the circumstances indicate that Szender's failure to have the document translated was excusable. He was presented with the contract the day that he was to sign it. The contract was written in English, a language that he could not read. Plaintiff, who spoke Hungarian, told him that the contract reflected their prior agreement. Although Szender should have reviewed the contract with the aid of a

translator or a lawyer who spoke Hungarian before signing it, he did not do that because he trusted plaintiff. That failure, under the circumstances, does not amount to gross negligence.

In summary, the evidence convinces us that it is highly probable (1) that plaintiff and Szender had an agreement antecedent to their written contract to which the written contract can be reformed, (2) that Szender made a unilateral mistake regarding the contents of the written contract and that plaintiff engaged in inequitable conduct regarding that mistake, and (3) that Szender's mistake was not the product of his own gross negligence. We therefore conclude that the trial court correctly reformed the parties' contract.

Plaintiff's remaining assignments of error depend on the proposition that the trial court erred in reforming the parties' contract. Because we have rejected that proposition, we reject the other assignments of error.

Affirmed.